IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| PETER BRICE MCKOY, JR., as Administrator of the Estate of John Carl West, Jr., et al., | ) ) ) |
| Plaintiffs, | ) ) ) 1:22-cv-604 (LMB/JFA) |
| v. | ) ) |
| THOMAS LANKFORD, et al., | ) ) ) |
| Defendants. | ) |

MEMORANDUM OPINION

On March 28, 2023, after a two-day trial, the jury returned a verdict in favor of plaintiffs Peter Brice McKoy Jr., Administrator of the Estate of John Carl West, Jr., and John C. West, Jr. LLC (collectively, "plaintiffs") on their breach of contract claim against defendants Thomas Lankford ("Lankford") and Lankford & Reed, PLLC (collectively, "defendants"), awarding $566,157.01 in damages. Before the Court is plaintiffs' Motion for Attorneys' Fees and Costs, which seeks recovery of $220,801.23 in attorneys' fees and $17,993.32 in costs, as well as an ongoing award of attorneys' fees representing 39% of future disbursements to plaintiffs under the operative contract. [Dkt. No. 97]. For the reasons that follow, plaintiffs' Motion for Attorneys' Fees and Costs will be granted in part and denied in part, and plaintiffs will be awarded $136,500.00 in attorneys' fees, no ongoing attorneys' fees, and $11,215.00 in costs.

I. BACKGROUND

A. **Factual Background**

This civil action originated from an arrangement between two lawyers, Lankford and John C. West, Jr. ("West"), who worked together for over fifteen years on securing compensation for a group of Americans who were taken hostage in 1979 at the United States

Embassy in Tehran, Iran (the Iran hostages). Their efforts eventually resulted in the enactment of the Justice for United States Victims of State Sponsored Terrorism Act ("the Act"), Pub L. No. 114-113, 129 Stat. 3007 (2015) (codified as amended at 34 U.S.C. § 20144), which established a fund to provide compensation to the Iran hostages and other eligible claimants ("the Fund"). Under the Act, the former Iran hostages, as well as their spouses and then-minor children, were eligible to receive up to $270 million from the Fund, with payments distributed to them in installments on a pro rata basis out of available funds. Since the Fund was established, the timing and amount of funds available for distribution have been contingent on several factors outside of the claimants' control.[1] As of the date of the jury trial, the former hostages and their family members remained eligible to receive future payouts from the Fund. The Act also authorized the lawyers working on behalf of the claimants to receive up to 25% of the payments distributed to the claimants as legal fees. 34 U.S.C. § 20144(f)(1).

In 2017, Lankford and his firm Lankford & Reed, PLLC received the first payment from the Fund for distribution to the claimants. Thereafter, on December 28, 2017, Lankford and his firm entered into a Settlement and Release Agreement ("Settlement Agreement") with West and his firm, John C. West, Jr. LLC, to resolve how West would be compensated for his work on behalf of the Iran hostages.

Under the Settlement Agreement, Lankford agreed to pay West "[i]n consideration of services in connection with the Iran Hostage Matter and subject to the covenants, agreements and condition set forth in this Agreement," (1) a payment of $300,000 "[s]imultaneously with the

---

[1] The Fund is replenished with property and funds obtained from civil and criminal enforcement of United States sanctions imposed on prohibited business transactions with state sponsors of terrorism, as well as from future judgments in specific civil actions involving Iran. 34 U.S.C. § 20144(e)(2).

2

execution of this Agreement," and (2) within 60 days after each distribution, 8⅓ percent of the legal fees owed to Lankford & Reed by the claimants from distributions from the Fund, not to exceed $2,700,000. [Pl. Ex. 1] § 3(A). The Settlement Agreement provided for a potential increase in West's compensation "to an amount not to exceed Five Million Dollars," in the event the former hostages received a lump-sum disbursement of "the balance of the 'eligible claims' owed to" them under the Act within two years of the date of the Settlement Agreement. Id. § 3(E). The parties agreed to release each other from "any and all [c]laims . . . includ[ing], without limitation, any claims relating to the Iran Hostage Matter," except obligations arising under the Agreement. Id. § 4(B). The Settlement Agreement indicated that it was "an integration of any and all prior agreements or understandings, oral or written, with respect to such subject matter," id. § 9(F), and prohibited modification or waiver of the agreement "except by an instrument in writing signed by the Party against whom enforcement of such change, modification, waiver, discharge or termination is sought," id. § 9(H).

Lankford paid West the initial sum of $300,000 pursuant to the Settlement Agreement. From January 2, 2019 through February 16, 2021, nine distributions were made to the former hostages from the Fund, for which Lankford and his firm received a total of $6,793,886.67 in legal fees. Lankford never paid West his 8⅓ percent share of the legal fees received from those nine distributions. In the interim, West passed away in March 2020.

### B. Procedural History

On December 23, 2021, the Estate of John C. West, Jr. ("the Estate") filed a seven-count complaint against defendants alleging that Lankford breached the Settlement Agreement by failing to pay West his share of the legal fees and fraudulently induced West to enter into the Settlement Agreement, among other claims. See Estate of John C. West, Jr. v. Lankford, et al., No. 1:21-cv-1438-TSE-IDD (E.D. Va. Dec. 23, 2021). On February 10, 2022, defendants filed a

3

motion to dismiss which pointed out that West's estate lacked legal authority to file the lawsuit. Id. [Dkt. No. 16]. In response, the Estate filed a notice of voluntary dismissal, which was entered on March 7, 2022. Id. [Dkt. Nos. 22, 23].

On May 25, 2022, plaintiffs filed a new civil action against defendants. [Dkt. No. 1]. The six-count Complaint alleged fraudulent inducement (Count I), breach of fiduciary duty (Count II), quantum meruit (Count III), and unjust enrichment (Count IV) (collectively, the "fraud claims"), and sought rescission of the Settlement Agreement. In the alternative to the fraud claims, the Complaint alleged breach of the Settlement Agreement (Count V) and sought recovery of West's 8⅓ percent share of the legal fees. The Complaint also requested equitable accounting (Count VI). Id.

On July 25, 2022, defendants filed a Motion to Dismiss the fraud and equitable accounting claims under Fed. R. Civ. P. 12(b)(6), [Dkt. No. 9].[2] On August 26, 2022, the Court granted defendants' Motion to Dismiss and dismissed the fraud and equitable accounting claims for failure to state a plausible claim for relief. [Dkt. No. 18].

On September 23, 2022, defendants filed an Answer, in which they raised one affirmative defense—verbal modification or waiver of the Settlement Agreement. [Dkt. No. 22]. Specifically, defendants asserted that, before his death, West orally modified or waived his right to further payments under the Settlement Agreement, including all nine disbursements made since January 2, 2019, because he had not succeeded in his efforts to obtain a lump-sum payment for the former hostages. On September 30, 2022, plaintiffs moved to strike the affirmative defense on the ground that it was invalid as a matter of law in light of the Settlement

---

[2] Defendants also filed a Motion to Strike the Complaint's references to other agreements, lawsuits, and settlement negotiations, the demand for attorneys' fees, and other "inflammatory" allegations, [Dkt. No. 7], which the Court denied, [Dkt. No. 18].

4

Agreement's clause prohibiting oral waivers or modification. [Dkt. No. 23]. The Court denied the Motion to Strike on October 28, 2022. [Dkt. No. 35].

Ten days before the close of discovery, plaintiffs attempted to revive the fraud claims and filed a motion to amend the Complaint and extend the discovery period. [Dkt. No. 53]. Plaintiffs argued that they had obtained evidence in discovery to support their claim for fraudulent inducement, asserting that the evidence showed that Lankford lacked a present intent to perform the Settlement Agreement beyond the first payment, misrepresented his intent to perform, and thereby fraudulently induced West to enter into the Settlement Agreement. Plaintiffs also sought to add a claim for civil conspiracy against two new defendants, Ed Wilson ("Wilson"), an attorney who knew West and Lankford and had assisted with their efforts to obtain compensation for the former hostages, and Wilson's law firm, Venable LLP. After reviewing the evidence proffered by plaintiffs and the proposed amended complaint, the Court found that the proposed claims would be futile and denied the motion to amend. [Dkt. No. 63].

On March 10, 2023, the Court heard pretrial motions and granted plaintiffs' and defendants' motions in limine, as well as plaintiffs' motion for leave to file a revised exhibit list. [Dkt. No. 81]. This civil action proceeded to a jury trial, which began on March 27, 2023.

The central issue at trial was defendants' affirmative defense, that is, whether West had orally waived both the Settlement Agreement's requirement that any waiver must be in writing and his claim to 8⅓ % of legal fee payments. The parties did not dispute that Lankford and West had entered into the Settlement Agreement, under which West was entitled to receive 8⅓ % of legal fees paid out from the Fund within 60 days of defendants' receipt of the disbursements; that nine disbursements were made between January 2, 2019 and February 16, 2021; and that West did not receive any share of the legal fees received by Lankford from those nine disbursements.

At trial, plaintiffs presented the testimony of one witness, Lankford, to establish breach of the Settlement Agreement. Defendants presented the testimony of Lankford and Wilson in support of their waiver defense. Including voir dire, the trial lasted six-and-a-half hours before being submitted to the jury, which returned a verdict in favor of plaintiffs, finding that defendants had not proven waiver by clear and convincing evidence. [Dkt. No. 93]. The jury awarded plaintiffs $566,157.01 in total damages, representing 8⅓ % of the legal fees received by Lankford between January 2, 2019 and February 16, 2021, with no pre-judgment interest. Id. The Court ordered the parties to meet and confer to try to resolve the issue of attorneys' fees and costs, and if unsuccessful, directed plaintiffs to file a fee petition within 30 days. [Dkt. No. 92]. The pending Motion for Attorneys' Fees and Costs followed, which has been fully briefed. [Dkt. Nos. 97, 101, 102].

## II. ATTORNEYS' FEES

Plaintiffs seek to recover their attorneys' fees pursuant to the indemnification provisions of the Settlement Agreement, which state:

> A. For all purposes of this Section 7, the indemnification obligation of a Party shall be comprised of any and all direct damages, losses, liabilities, obligations, fees, costs, expenses and reasonable attorneys' fees of the Party entitled to indemnification (hereinafter individually and collectively referred to as the "Losses") with respect to the matters specified herein.
>
> B. Each of the [Lankford & Reed] Parties, on the one hand, and the West Parties, on the other hand, shall defend, hold harmless and indemnify each other for any and all Losses, by reason of, or arising out of, or in connection with, any breach or violation of any or all of the respective representations, warranties, covenants, agreements, releases or obligations of any one or more of them as set forth in this Agreement.

[Pl. Ex. 1] § 7. The parties do not dispute that plaintiffs are entitled to recover their reasonable attorneys' fees under the Settlement Agreement but disagree as to the method by which the fee award is to be determined and the appropriate amount for an award.

6

Plaintiffs retained their counsel, Timothy Clinton ("Clinton") of Clinton & Peed, on a contingency fee basis, under which they seek to recover attorneys' fees of $220,801.23, which represents a "39% contingency fee" applied to the $566,157.01 damage award. Plaintiffs also seek a "39% contingency fee to be added to" any future payments by Lankford of West's 8⅓ % share of legal fees, should there be any future distributions to the former hostages from the Fund. [Dkt. No. 97] at 1. Although plaintiffs' contingency fee agreement with Clinton provides that counsel will receive a substantially higher fee of 65% of the judgment awarded,[3] plaintiffs' fee petition seeks "only a 39% contingency fee," which is "less than the fees [they] will incur under the terms of its engagement agreement with its lawyers," to "facilitate prompt resolution of the matter." Id. at 3. Notably, the requested fee amount is 1.5 times greater than the value of Clinton's time on a "lodestar basis," which Clinton avers is $149,400, based on 249.3 hours of work at an hourly rate of $600.[4] See id. at 9, 11. Defendants argue that basing an attorneys' fee award on a contingency fee agreement is inappropriate given that this was a standard breach-of-contract action, particularly where the contingency fee is "excessive." They further argue that

---

[3] Plaintiffs' contingency fee agreement provides that counsel shall be compensated by payment of a "Contingency Fee that shall be calculated as . . . the greater of: (a) any award of attorneys' fees; or (b) the Contingency Percentage (defined below) times the sum of any judgment, award, or settlement amount and any judgment, award, or settlement, of attorneys' fees." [Dkt. No. 97-1], Ex. E at 2. The percentage changed based on the stage of the litigation. Because the civil action was resolved after trial, the applicable Contingency Percentage is 65%, to be applied only "to amounts in excess of the settlement offer currently on the table ($125,000 plus 3% of fees paid to Lankford & Reed in the future)." Id. Had the action "settled during the Pre-Litigation Phase," the Contingency Percentage would have been 55%, and had it "settled during the Pre-Trial Phase," the Contingency Percentage would have been 60%. Id.

[4] Plaintiffs also retained local counsel to represent them in connection with this litigation but have "elected not to seek to recover the more than $20,000" paid to that attorney. [Dkt. No. 97] at 3. There are no records of this attorney's work before the Court and accordingly these fees are not considered.

7

the fee award should be determined using a traditional lodestar analysis. Accordingly, the Court first considers the method by which plaintiffs' fee award should be determined.

### A. Method for Calculating Attorneys' Fee Award

Under Virginia law, when "contracts provide[] for attorney's fees, but d[o] not fix the amount thereof, a fact finder is required to determine from the evidence what are reasonable fees under the facts and circumstances of the particular case." Mullins v. Richlands Nat'l Bank, 403 S.E.2d 334, 449 (Va. 1991). In determining the amount of fees that are reasonable, the relevant factors to consider are set forth in Barber v. Kimbrell's Inc., 577 F.2d 216 (4th Cir. 1978):

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Robinson v. Equifax Info. Servs., 560 F.3d 235, 243 (4th Cir. 2009) (quoting Kimbrell's Inc., 577 F.2d at 226 n.28); see Chawla v. BurgerBusters, Inc., 499 S.E. 2d 829, 833 (Va. 1998) (providing that "[i]n determining whether a party has established a prima facie case of reasonableness," a court should consider "the time and effort expended by the attorney, the nature of the services rendered, the complexity of the services, the value of the services to the client, the results obtained, whether the fees incurred were consistent with those generally charged for similar services, and whether the services were necessary and appropriate").[5]

---

[5] The Kimbrell's factors mirror the factors articulated by the Virginia Supreme Court that are to be considered in assessing the reasonableness of a fee request. See Airlines Reporting Corp. v. Sarrion Travel, Inc., 846 F. Supp. 2d 533, 537 (E.D. Va. 2012); Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship, 730 F. Supp. 2d 513, 519 (E.D. Va. 2010).

8

The parties do not dispute that the touchstone of the Court's fee-award determination is reasonableness, but they disagree as to the method by which the Court should determine the reasonableness of the fee. Plaintiffs argue that the starting point for the Court's analysis is the contingency fee to which plaintiffs agreed in their retainer agreement. Defendants assert that the starting point should be the lodestar—that is, the reasonable hours expended by counsel on this litigation multiplied by a reasonable hourly rate—and not a contingency rate.

This Court has previously found that where a plaintiff has entered into a contingency fee agreement with its counsel, "the Court must still evaluate the reasonableness of the claimed fees." Airlines Reporting Corp. v. Acad. Travel Servs., No. 1:11-cv-965, 2012 WL 13020807, at *2 (E.D. Va. July 12, 2012). As Judge Ellis has similarly observed, a contingency fee agreement between plaintiff and plaintiff's counsel is "not controlling" in determining a fee award. Airlines Reporting Corp. v. Sarrion Travel, Inc., 846 F. Supp. 2d 533, 537 (E.D. Va. 2012) (observing that a plaintiff's contingency fee agreement with counsel "is not controlling"); see Job Am. Mgm't Exp. Imp.—N. Carolina, Ltd. v. Kaltone Petrol. Mktg. Corp., No. 4:99-cv-24, 1999 WL 33228367, at *7 (E.D. Va. Dec. 10, 1999) ("[W]hatever arrangement the plaintiff has with its counsel is of no relevance to the Court's determination as to the 'reasonable fees' owed by the defendants based on the specific circumstances of this litigation."). When faced with a contingency agreement, courts have evaluated the requested fee award using the well-established lodestar method of calculating the hours reasonably expended by counsel on the litigation and the reasonable hourly rate, followed by adjusting the resulting lodestar amount pursuant to the Kimbrell's / Chawla factors. See Airlines Reporting Corp., 2012 WL 13020807, at *2; Jobs Am. Mgm't, 1999 WL 33228367, at *7; Sarrion, 846 F. Supp. 2d at 538-41. Although plaintiffs do not seek to recover the contractual contingency fee of 65% and have reduced their request to

9

39%, the Court agrees with defendants that an independent inquiry into reasonableness is required, the starting point of which is the lodestar.

Plaintiffs claim that under the circumstances of this case—specifically, the indemnification clause in the Settlement Agreement between West and Lankford—the contingency fee is reasonable. Plaintiffs assert that defendants' indemnification obligation provides for recovery of "any and all . . . losses," [Pl. Ex. 1] § 7(A), and they contend that the contingency fee incurred "under the terms of their engagement with . . . Clinton & Peed" is a "loss" that is recoverable from defendants, provided the fee is reasonable. [Dkt. No. 97] at 5.

As an initial matter, plaintiffs' attempt to argue that their fee award should be considered a "loss" pursuant to the indemnification clause is unpersuasive because the clause clearly distinguishes between "losses" and "reasonable attorneys' fees." See [Pl. Ex. 1] § 7(A) (providing that the "indemnification obligation . . . shall be comprised of all direct damages, losses . . . and reasonable attorneys' fees of the [p]arty entitled to indemnification"). Moreover, as defendants correctly observe, the indemnification clause does not provide for payment of "attorneys' fees incurred" but for the "reasonable attorneys' fees" of the party entitled to indemnification. Id. Given the language in the indemnification clause and jurisprudence from this district, the Court will use the lodestar method, rather than plaintiffs' contingency agreement, to determine a reasonable attorney's fee. See Coady v. Strategic Res., Inc., 515 S.E.2d 273, 276 (Va. 1999) (evaluating the reasonableness of an attorneys' fee request pursuant to a "broad and all-encompassing" indemnification clause based on "the time consumed, the effort expended, the nature of the services rendered, and other attending circumstances"). Because plaintiffs are "seek[ing] to pass along to an adversary the cost of attorney's fees," Portsmouth 2175 Elmhurst, LLC v. City of Portsmouth, 837 S.E.2d 504, 515 (Va. 2020), their

fee request under the Settlement Agreement's indemnification clause is, as a practical matter, no different than an ordinary request for an award of attorneys' fees under a fee-shifting framework.

Plaintiffs have not pointed to any authority that supports their position that an attorneys' fee award in a fee-shifting case may be determined solely by reference to a contingency percentage. To justify recovering a premium over the lodestar amount, plaintiffs cite cases in which courts applied a multiplier to a lodestar amount in determining a reasonable fee award, but all of those cases are inapposite because they involved complex common fund or class action litigation. In common fund cases, fees are often awarded based on a "percentage of the benefit secured for the settlement class" which can be greater than the lodestar amount, but this civil action is not a common fund case and plaintiffs do not explain why common fund cases are applicable. See Skochin v. Genworth Fin., Inc., No. 3:19-CV-49, 2020 WL 6708388, at *9-11 (E.D. Va. Nov. 13, 2020); Brundle v. Wilmington Tr., N.A., 258 F. Supp. 3d 647, 670-72 (E.D. Va. 2017). Plaintiffs also cite cases in which courts reviewed contingency fee arrangements between plaintiffs and their counsel pursuant to their supervisory jurisdiction over contingency fee contracts; however, none of those cases involved a contingency fee that was being assessed against an opposing party on top of the awarded damages. See Allen v. United States, 606 F.2d 432 (4th Cir. 1979) (evaluating whether the district court properly ordered the government to remit 20% of the plaintiffs' recovery directly to the plaintiffs' lawyers in satisfaction of their oral contingent fee contract and remanding to the district court to determine whether the contingency fee was reasonable); In re Abrams & Abrams, P.A., 605 F.3d 238 (4th Cir. 2010) (holding that a district court abused its discretion in reviewing a settlement agreement, which provided that one-third of the settlement would be used to satisfy the plaintiff's contingency fee agreement with counsel, when it reviewed the contingency fee for reasonableness and reduced it to 3%); Gilbert

LLP v. Tire Eng'g & Distrib., LLC, 689 F. App'x 197, 202 (4th Cir. 2017) (considering fees to be paid to an attorney in quantum meruit where the attorney was discharged from a contingency fee contract without just cause and sought recovery for services performed, which was "not a fee-shifting case").

This civil action is substantially different from the aforementioned cases because plaintiffs seek to shift their responsibility for a fee payment pursuant to a private contingency fee agreement onto defendants who were not a party to that private agreement. Ultimately, a contingency fee agreement is between a client and his or her counsel. As the Supreme Court has explained in the context of statutory fee-shifting provisions, "[w]hat a plaintiff may be bound to pay and what an attorney is free to collect under a fee agreement are not necessarily measured by the 'reasonable attorney's fee' that a defendant must pay pursuant to a court order." Venegas v. Mitchell, 495 U.S. 82, 90 (1990); see Lyle v. Food Lion, Inc., 954 F.2d 984, 988 (4th Cir. 1992) (observing that in a statutory fee-shifting case, "the defendant is not . . . required to pay the amount called for in a contingent-fee contract if it is more than a reasonable fee calculated in the usual way," i.e., the "lodestar approach").

In the absence of authority suggesting that the Court may simply look to the contingency percentage in determining a fee award, the Court will apply the well-established lodestar method, adjusting the fee amount for reasonableness based on the Kimbrell's / Chawla factors. That is not to say that plaintiffs' contingency arrangement has no bearing on the assessment of reasonableness; rather, in statutory or contractual fee-shifting cases, the Virginia Supreme Court has advised that where a "case involved a contingency fee," "[j]udicial review of the reasonableness of attorney's fees should take into account the fact that the lawyer is operating under a contingency fee." Portsmouth, 837 S.E.2d at 515. That consideration is subsumed in the

lodestar analysis, particularly in Kimbrell's factor 6, which considers the attorney's expectations at the outset of the litigation, as well as factor 5, the customary fee for like work, and factor 12, the attorneys' fee awards in similar cases. See Sarrion, 846 F. Supp. 2d at 538 n.5 (observing that the contingency fee agreement is properly considered as part of Kimbrell's factors 5, 6, and 12); In re Abrams, 605 F.3d at 244 n.3 (explaining that Kimbrell's factor 6 asks "how an attorney anticipates being paid" and considers the "contingency of a fee" in cases involving a contingency fee (discussing Allen, 606 F.2d at 436 n.1)); cf. City of Burlington v. Dague, 505 U.S. 557, 562-63 (1992) (rejecting a contingency enhancement for a fee award under a federal fee-shifting statute in part because the risk of loss borne by an attorney in a contingency fee arrangement is reflected in the lodestar). In sum, rather than begin with whether a 39% contingency fee is reasonable in this case, the Court will consider plaintiffs' contingency fee arrangement as part of its adjustments to the lodestar.

### B. Reasonable Attorneys' Fees

Plaintiffs' counsel avers that he expended 249 hours on this litigation at an hourly rate of $600, for a total of $149,400. [Dkt. No. 97-1], Ex. J ¶ 2. To determine the lodestar figure, the Court must first evaluate the reasonableness of Clinton's hourly rate. There is no dispute that a $600 rate is reasonable for Clinton based on his 17 years of experience, see id., Ex. B ¶ 11. It also falls within the range of hourly rates for an attorney with commensurate experience routinely used in this Court under the Vienna Metro matrix. See Cho v. Joong Ang Daily News Wash., Inc., No. 1:18-cv-1062 (LMB/IDD), 2020 WL 1056294, at *4-5 (E.D. Va. Mar. 4, 2020); Vienna Metro LLC v. Pulte Home Corp., No. 1:10-cv-502, 2011 WL 13369780, at *6 (E.D. Va. Aug. 24, 2011) (providing that the prevailing hourly rates for an attorney with 11 to 19 years of experience is $520 to $770 in Northern Virginia). Defendants argue that the fee award should be based on an hourly rate of $400 for Clinton because plaintiffs' original retainer agreement dated

13

June 22, 2021 provided for a discounted hourly rate of $400, without a contingency fee, and the rate was only increased to $600 six months later in their December 15, 2021 retainer agreement, which also added the contingency fee. As plaintiffs correctly point out, the June 22, 2021 retainer agreement was limited to an "initial analysis of the relative merits of litigation" with defendants, whereas the December 15, 2021 retainer agreement was the operative agreement covering this litigation, and it provided for Clinton's customary hourly rate based on his credentials and experience. See [Dkt. No. 97-1], Ex. B ¶ 11. Accordingly, the Court finds that a $600 hourly rate for Clinton is appropriate and reasonable.

Defendants contend that the 249.3 hours of work expended by Clinton must be reduced because only 124.4 hours of his time was "necessary and reasonable to prove a simple breach of contract claim," [Dkt. No. 101] at 20, and the fee amount should be further reduced to account for the litigation of unsuccessful claims, id. at 23. The Court agrees with defendants that the 21.8 hours that Clinton spent working on the first complaint against Lankford that was voluntarily dismissed on March 7, 2022 should be excluded because Clinton should have realized that the complaint was legally insufficient.

Of the remaining 227.5 hours, the Court finds that no additional reduction is required, producing a lodestar of $136,500.00. Under ordinary circumstances, a pure lodestar analysis would warrant a further reduction based on Clinton's pursuing the unsuccessful fraud claims, which included his attempt to revive the dismissed claims through a motion to amend filed near the close of discovery (Kimbrell's factor 8). Moreover, this civil action was neither novel nor complex as it involved only a single breach of contract claim (Kimbrell's factor 2), and contrary to plaintiffs' assertion that the Court had described the civil action as complex, the Court did not find that "the legal issues were deceptively complicated." [Dkt. No. 97] at 13. When the Court

described plaintiffs' lawsuit as a "tough case" during the February 16, 2023 hearing, that was a reference to the evidentiary challenge of proving a breach of contract claim based solely on the text of the contract when "two live witnesses" would be testifying that West, who was deceased, had waived his claim for any further compensation. [Dkt. No. 67] at 24.

Nevertheless, the lodestar will not be further reduced because Kimbrell's factor 6, "the attorney's expectations at the outset of the litigation," is an appropriate consideration under the circumstances. Robinson, 560 F.3d at 243 (quoting Kimbrell's Inc., 577 F.2d at 226 n.28); see Portsmouth, 837 S.E.2d at 515. Clinton maintains that it was difficult to predict the success of plaintiffs' suit at the onset of litigation because of the "daunting task of prosecuting a lawsuit without the benefit of its key (and generally sole) witness to the relevant events at issue: decedent Jack West, Jr. himself." [Dkt. No. 97] at 8. He further asserts that his firm shouldered substantial risk in representing plaintiffs because they were purportedly unable to afford counsel, and he believed that the "amount at stake was unlikely to be sufficient to compensate the firm when compared to its regular hourly rates" given that prosecuting the case would involve "substantial" time and effort. Id. at 8. The Court accepts that in this case, retaining counsel on a contingency fee provided plaintiffs with "access to the legal system" by "transfer[ring] a significant portion of the risk of loss to the attorneys taking a case," In re Abrams, 605 F.3d at 246, and that as a result Clinton took on a substantial risk that he and his firm might not receive any legal fees from this litigation. For these reasons, the Court finds that the Kimbrell's factors balance out and do not require a further reduction of Clinton's hours; however, there is also no basis to add a multiplier to the lodestar and increase the fee award because of plaintiffs' lack of success on its fraud claims and the relative lack of complexity in this dispute.

Even though a fee award of $136,500.00 is substantially lower than the fee amount which plaintiffs seek, this amount fairly compensates Clinton for his work on this civil action. Although it was plaintiffs' decision to enter into a contingency fee arrangement with their attorney, "the district courts' supervisory jurisdiction over contingent fee contracts for services rendered in cases before them is well-established," Allen, 606 F.2d at 435, and here, the Court finds that the high contingency fee to which plaintiffs agreed to pay, should not be imposed on the defendants. Clinton cites no authority supporting his claim that the contingency fee arrangement of 65%, which he describes as a "nuanced, creative arrangement," is an appropriate or acceptable fee structure, and even the reduced fee of 39% is too high for a case as simple as this one. As defendants' expert averred, in Virginia a typical contingency fee ranges from 33.3% to 40%. [Dkt. No. 101-3] ¶ 45. Plaintiffs' expert Bernard J. Dimuro's ("DiMuro") attempts to justify the 65% contingency fee arrangement is unsupported by any authority. See [Dkt. No. 97], Ex. N.

In sum, an award of the lodestar with no reduction for unsuccessful claims is reasonable and fairly compensates counsel for his work on this litigation. Accordingly, plaintiffs will be awarded $136,500.00 in attorneys' fees.

### C. Prospective Attorneys' Fees

Plaintiffs also seek an ongoing fee award representing 39% of any future distributions of legal fees to Lankford, to be added on to the 8⅓ % of legal fees distributed to West's estate. Plaintiffs argue that counsel's "trial victory necessarily means that Lankford & Reed is required to make those future payments, so it is fair to award the firm with a percentage of those future payments." [Dkt. No. 97] at 12. There is no merit to this request. First, as defendants correctly point out, the indemnification clause only provides for indemnification of attorneys' fees "arising out of, or in connection with, any breach or violation of any or all of the . . . obligations . . . set

forth in this Agreement." [Pl. Ex. 1] § 7.  Future distributions from the Fund by definition have not been paid to defendants, therefore defendants have not breached their obligation to pay plaintiffs the 8⅓ % of the legal fees received from distributions which have not yet occurred.  Accordingly, the indemnification clause does not support a future, ongoing award of attorneys' fees.  Moreover, plaintiffs cite no authority supporting a court's award of an ongoing contingency fee to continuously compensate counsel who brought a lawsuit only seeking damages to remedy defendants' breach of contract.  Accordingly, plaintiffs' request that defendants pay an ongoing 39% contingency fee based on any future payments plaintiffs receive under the Settlement Agreement will be denied.

## III. COSTS

Finally, plaintiffs seek to recover $17,993.32 in expenses and costs incurred throughout this litigation, consisting of the following:

| Type of Cost | Costs Incurred |
|---|---|
| Filing Fee | $402.00 |
| Deposition Expenses | $3,496.50 |
| Transcript Fees | $316.50 |
| Expert Witness Fees | $13,778.32 |
| Total: | $17,993.32 |

[Dkt. No. 97-1], Ex. J, at 102-111.  Plaintiffs assert that they have elected not to seek recovery of "over $10,000 in other fees and expenses[.]" [Dkt. No. 97] at 15.  Litigation expenses and costs are recoverable pursuant to the Settlement Agreement, which provides for indemnification of "all . . . fees, costs, [and] expenses . . . of the Party entitled to indemnification." [Pl. Ex. 1] § 7.

The only expenses defendants challenge is the $13,778.32 paid to DiMuro for expert services regarding an appropriate attorneys' fee award.  DiMuro billed $13,778.32 for preparing several expert reports, namely his first report dated December 16, 2022 attesting to the

reasonableness of a 65% contingency fee, a rebuttal report dated January 31, 2023, and a final report supporting a 39% contingency fee prepared in support of plaintiffs' fee petition. Defendants contend that plaintiffs abandoned the first and rebuttal reports "without explanation" and therefore those reports "cannot be characterized as successful for reimbursement or indemnification purposes." [Dkt. No. 101] at 15-16. Plaintiffs correctly respond that DiMuro's first and rebuttal reports were not abandoned but were actually included as Exhibits N and O to plaintiffs' fee petition. Although the Court finds that DiMuro's conclusions about the reasonableness of Clinton's complex contingency arrangements with plaintiffs is unsupported by any case law and, therefore, is rejected, portions of his reports were useful in evaluating plaintiffs' decision to agree to such an arrangement and did contribute to the determination of the appropriate lodestar. For these reasons, DiMuro's fees will be reduced by approximately one-half to $7,000.00, which the Court finds adequately covers the portions of his reports that were useful.

## IV. CONCLUSION

For the reasons explained above, plaintiffs' Motion for Attorneys' Fees and Costs [Dkt. No. 97] will be granted in part and denied in part by an Order that will award plaintiffs $136,000 in attorneys' fees and $11,215.00 in costs and expenses.

Entered this 23rd day of August, 2023.

Alexandria, Virginia

/s/ 
Leonie M. Brinkema
United States District Judge